Good morning, your honors. My name is Tim Gabrielson, and I'm here from the Federal Public Defender's Office of the District of Arizona, along with Paula Harms, my co-counsel, on behalf of Mr. West. Mr. West was convicted of first-degree felony murder in the Superior Court of Pima County and sentenced to death. The appeal that we have before your honors this morning concerns the narrow question of whether Mr. West should have received an evidentiary hearing on a claim of ineffective assistance of counsel before the district court. Counsel, let me tell you my initial take on it so you can educate me out of it. Please, your honors. Before statehood in 59, Alaska had a hanging judge, and it really didn't matter how great the lawyer was, if the client committed a first-degree murder or I don't know if felony murder counted in those days, he was going to hang, literally. It didn't matter if it was a great lawyer. I look at this case, and it looks like really good lawyering to me. I look to see what the defense, what the appellant's lawyers had come up with, that if only West had a better lawyer, then his lawyer would have put this in, and it would have saved him. And I can't see that there is much. It's negligible. It's questionable whether it can even be considered because of when it came in, and even assuming it can, all it is is a doctor speculating that he might have given him a little bit more of a mental condition diagnosis, PTSD or something. It didn't look like it would make any difference. And it looks like the reason this guy is sentenced to death is the judge's view rather than bad lawyering. Cure me of this, what you must think is a misconception. Of course, Your Honor. The problem here is that Mr. West didn't have an evidentiary hearing where he could have developed his themes of mental illness. So what did he have? Well, you alluded to it, post-traumatic stress disorder, which this court has held in repeated cases. The U.S. Supreme Court just held in Porter v. McCollum a month or so ago. That's powerful mitigation, that even in the face of a highly aggravated murder, that still might be enough to convince a sentencer not to impose the death penalty. Well, Mr. Gableson, maybe you can incorporate, I'll kind of give you my area that I want you to address, since you're going to be, you can incorporate it as you're answering Judge Kleinfeld's question, that it is about whether he's entitled to an evidentiary hearing. And you have issues like diligence, and you have what can you show. And while you're talking about this, you know, tell me about what identified in the record, what alleged mental impairments that the trial counsel should have investigated. Where can I find a description of them in the record? Because it seems that the approach is, well, because he didn't have an evidentiary hearing, he couldn't develop these things. But my understanding of the law is you have to show your right to an evidentiary hearing, which means you have to make a certain showing. There has to be a certain diligence so that the court knows what would happen in the evidentiary hearing. The purpose of the evidentiary hearing isn't to develop it. The purpose is to show, hey, this is what we would show, and show me in the record where that is. And then you get the evidentiary hearing. So the evidentiary hearing isn't to show you're entitled to an evidentiary hearing. Do you understand? Absolutely, Your Honor. I do understand what you're talking about. And, you know, we did our best in the brief, and I'd like to speak this morning to what those indications were in the record that should have alerted trial counsel that there was more that should have been done. And first of all, we have to go back to the original evaluation that the psychologist did, Dr. Allender. There's no indication on this record that Dr. Allender was retained for the purpose of evaluating Mr. West with an eye toward developing litigation claims for sentences. Here's the problem. It looks to me as though what you've got, the core of what you've got now that you say the lawyer should have developed and put before the trial judge, is Allender's 81208 letter. And all he says in the 81208 letter is, had this information been presented to me at the time I evaluated Mr. West, it would have warranted additional questioning of Mr. West on my part and may have affected my diagnosis of him. Given the history within the records I reviewed, I think that Mr. West may have suffered in the past and may still suffer from post-traumatic stress disorder. It looks like even if the lawyers had been as perfect as habeas counsel think they should have been, the best they'd get is speculation on possible post-traumatic stress disorder that would have led Dr. Allender to more questioning about it. Have I missed something? Is there more? Yes, there is more, Your Honor. The problem is Dr. Allender has not had an opportunity. The matter has not been remanded for an evidentiary hearing. The funds have not been expended to get Dr. Allender up to the prison to see Mr. West again. We inherited the case when it was already before this Court. We weren't in a position to try to develop this record sooner, so the Court has to keep that in mind. But we're really basing our request on the 1987. Yes, things get fleshed out in the 2008 report of Dr. Allender and what's significant, and this case is on all fours with Rompilla in this respect, if Dr. Allender had been given the transcripts of the family interviews, which did exist prior to the capital sentencing hearing on August 1st of 1988, this is the diagnosis he, at this point, thinks that he feels most secure about bringing. But, again, he wants to see Mr. West to flesh out that diagnosis. So what you're telling us, at this point, we don't really have evidence that would show that anything counsel did would have made a difference. But given more time and more money, we may be able to develop something. Well, at this stage, we can't prove the totality of a claim of either deficient performance or prejudice, but what we can show is the colorable claim for both deficient performance and prejudice that are required to be shown in order for this Court to grant an evidentiary hearing. But didn't that have to be, I guess I have the additional question here, that the 2008 letters that you're talking about from Allender and I think it's Cobell? Cobell, yes, Your Honor. They weren't part of the record of the district court. That's correct. So should we even be considering them? Even without considering, well, I take that back. With regard to Dr. Allender's report, you know, one of the problems was the denial of funds, both in the state post-conviction proceedings and, again, in the U.S. District Court. The funds were not allocated so that these mental health experts could actually do the evaluation that would have fully fleshed out these claims. Were the funds requested? Yes, Your Honor. The funds were requested as part of the diligence argument in the state post-conviction. As Carla Ryan, who was appointed in both state post-conviction and federal habeas to represent Mr. West, she made five distinct requests for funds in the state court. She also requested evidentiary hearings in the state court. With each request for funds, she asked to have her experts heard as well. Well, can we go back to at one point in the trial in 1988, the state moved for disclosure of the interviews with two mental health doctors, Dr. Oberbeck and Dr. Allender. So was there a report of an interview or an interview by Dr. Oberbeck? The record doesn't speak to that, Your Honor. The record speaks about it. The record speaks to the court authorizing transportation of Mr. West from the county jail to Dr. Oberbeck's office. We don't know whether he was ever transported, and frankly, we don't. He may have been seen by Dr. Oberbeck, but our record as it sits right now, we don't know that. At the time that that was requested by the state, reading the transcript, the defense counsel says that he may not even call them, although they're listed on the witness list, and then later he tells the court that he decided not to call them for strategic reasons. What do we make of that? Your Honor, to sort of complete that picture, when the prosecutor says we want to know if the defense is putting on mental health mitigation, Mr. Dawley, lead defense counsel, says, and I quote, as far as the experts go, we really haven't decided. I think Mr. Peasley, prosecutor, is referring to a letter I just sent over. That's the one you referenced, Your Honor, where he says we may not call them. I guess that's what gave me the impression that they were hired for mental health mitigation is because the government asked for the discovery of mental health mitigation, and the trailer says, well, I'm not sure I'm even going to call them. Your Honor, the next sentence I would read is critical. We have to decide whether we will call some experts to examine Mr. West. But we know Allender had examined him. Well, he examined him, but we don't know the purpose of it. Dr. Allender examined Mr. West prior to any documents being produced to Dr. Allender. He did a neuropsychological evaluation, and he did a mental status exam on Mr. West. He did not have the interviews with the family members that Dr. Allender and Judge Callahan. You're right. I mean, the family interviews, while they were known to defense counsel, the 2008 report wouldn't be relevant to this discussion of whether there's a colorable claim. The problem is that Dr. Allender's report was a little underwhelming in Mr. West's favor at that point. I mean, he did look into some of the things about his mental impairment, and I think he called him something low to normal in terms of his intelligence. He didn't really feel that these car accidents or that he had the head injury issue. And so, you know, there's ‑‑ I mean, counsel could have acted reasonably in that, you know, Dr. Allender, you know, was not really terribly helpful to Mr. West's, you know, claims of mental health problems, you know, at the time, and counsel decided to go more the substance abuse route as mitigation. And still, at this date, we still don't really have anyone saying that Mr. West is, you know, I still don't really know what his impairments are. The best we've got is you're saying we need more time, even though it's been 20 years. We need more time to figure out what's wrong with him. And I think what the government or, you know, the appellees are arguing is you still have to make some sort of showing before that that there's, you know, sort of where's the beef, you know, at the hearing. Absolutely, Your Honor. Dr. Allender found that Tom West was cognitively impaired on the basis of the information he had. Exactly, cognitively impaired. What he said was not very bright, a lot of dope. He actually said cognitively impaired. He wasn't so normal, as I recall, in the 80s in IQ. On some of the subtests, he identifies where Mr. West fits in there. But in his conclusion, he says he finds cognitive impairment. He's not sure if that's due to organic brain damage. It could be due to substance abuse, and it could be due simply to Mr. West suffering from a learning disability. Let me ask you a couple specific questions. This letter that we discussed a moment ago in 2008 from Allender, was that letter before the district court? No, it was not, Your Honor. It was part of the 60B proceedings that we brought when we were appointed to the case. And my second question is, I don't know if it's a question. It's an impression that you have to cure. As I understand it, you don't get to come to the federal appellate court in a habeas 20 years later and say, we need more time and more money to try to find out if there's something wrong with the guy. You come to the federal appellate court in a habeas 20 years later to say, we have demonstrated in district court that there is something wrong with the guy that would have mitigated his sentence. And if his lawyer had done a minimally competent job satisfactory under Strickland, his lawyer would have shown this to the trial judge, and that would have changed the outcome. And then you have an evidentiary hearing where the lawyer says, this is why I didn't do that, or the prosecutor puts on some sort of evidence to show it wouldn't have made any difference, and the defense shows it would have made a big difference if only they'd done that, and the witnesses would have been really strong. It looks as though we're in the wrong posture, and you just don't have what you need to get an evidentiary hearing under Supreme Court precedent. I couldn't more strongly disagree with that. I'm happy to be disabused of this. Because going back to the state post-conviction proceedings, Ms. Ryan, despite her numerous requests, was denied the funds to further develop the record, but she put the state court on notice as to not only Dr. Allender's 1987 report, which states the factors that I just reiterated, and some other things with regard to prior administrations of psychoactive medications for Mr. West. He was diagnosed by psychiatrists in the Illinois prison system, given psychoactive medication. Ms. Ryan put that in front of the state post-conviction court, still could not get the funds to actually bring in somebody to evaluate what Mr. West suffered from. You don't have a COA on inadequate funding for investigation, deprivation by the government of adequate funding, do you? Adequate funding. I don't believe in habeas we can raise any issue concerning the proceedings that happened in the state court. However, obviously under Williams v. Taylor, if Mr. West did what he needed to do in order to obtain an evidentiary hearing in that court to develop his facts, then the constitution, the decision in Williams, requires that we come out from within the AEDP altogether. We go on a separate track to decide Mr. West's funding issues, the failure to allow the development of the record in the state court, and obviously sort of the process by which this court decides whether habeas relief should be granted or not. And there's no question in this case Ms. Ryan was diligent. And even the U.S. District Court judge found that she was diligent, despite my opposing counsel's argument to the contrary. Let me ask just a couple of questions on different issues for a second. First, is the state correct that the COA has now effectively been narrowed to impaired mental health and head injuries? Not completely, Your Honor. That certainly is a thrust of our brief. But the other issues, as we indicate in our brief, are subsumed within that, including the allegations that there was a sexual assault, for example, that the mental health experts should have known about and didn't, and some other things. But no, we haven't waived the rest of those claims. I will say this, and this is consistent with our brief, the witness that the defense attorney did put on, Mr. Hickey, he spoke to Mr. West's drug use as a child and some of the family dysfunction. And I think had an actual mental health expert evaluated Mr. West for mitigation, that might have been a nice complement to that evidence. But it was not sufficient standing alone because Mr. Hickey wasn't qualified to make a mental health diagnosis. If the judge were not inclined to be very harsh, I thought Hickey's testimony was pretty good. I would disagree to this extent, Your Honor. The drug and alcohol used by Mr. West, even as Mr. Hickey said, that was a symptom of something else. But the something else is a thing that's not clear on this record. But Dr. Allender's 1987 report starts to get at that. He's been diagnosed with this cognitive dysfunction. He may have organic brain damage that he hasn't been tested for. That in combination, and some of his disorders predated the drug use and even the family abuse. There are school psychology reports. How come he's never been run by a psychiatrist who would get, I don't know, a PET scan or something, so you could really find out definitively whether he had organic brain damage? How come we haven't done that, Your Honor? For example? Well, I mean, we've got a limited budget, too. I've gone to my supervisors. We triage these cases when somebody has an evidentiary hearing coming or a more pressing need to get the funds from our office. So it's not as though it's been done and it came out negative. Oh, no. It hasn't been done. I'm waiting to try to get funding to get Dr. Allender up to actually evaluate Mr. West now. Well, he's just a Ph.D. psychologist. He can't admit people for MRIs and PET scans and CAT scans and all that stuff. No, he can't. We need a medical doctor for that. We asked the court for permission to have a neuropsychologist evaluate Mr. West. Frankly, we had some competency and other concerns when we got appointed to the case, and that expert has also said that he thinks there are scans available that would flesh out what's wrong with the potential problems of an organic nature that are afflicting Mr. West. So it is within our contemplation that those things be done, but we are mindful of the rules of this court are that we can't just come in here and start bringing in piles of new evidence. The things that Judge Callahan talked about were things that were germane to the Rule 60B litigation we did. We tried to get Judge Burry to allow us to start to reopen so we could flesh out the problem. So is your evidentiary hearing to just basically conduct discovery to figure out what's wrong with Mr. West? No. Our experts are ready and willing to testify. We could have a hearing next week if this court gave the order. We're ready to go. What experts? Dr. Allender is ready to go to the prison to see Mr. West. No, but we don't know what he would say. I mean, what you're saying is he's ready to go and then to tell everybody. But what if, you know, he's saying he may have this and he may have that. Right. I mean, we're used to seeing that people at this stage would say, you know, their offer of proof for a hearing would be that Mr. Allender has this and has that, and that wasn't before the court, and it would have made a difference. Yes, and I'm mindful of the dissenting opinion that Your Honor, Judge Kleinfeld, was on a short time back in Pinholster. The ADDPA forces a petitioner to develop his facts in state court. Ms. Ryan tried five times to get the funding to get the people in to evaluate Mr. West, and that was done with an eye toward, as the panel of this court said recently in Hovey v. Ayers, what we need to do is we have to look at the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented. That's what our briefing goes toward. We have called from the record not only Dr. Allender's report, but the Illinois prison records, the school records, the interview with Mrs. West about her son being placed in special education, being referred for psychological counseling from the school, and the family not being able to afford it. We've called from this record the indicia that show that Mr. West suffers from mental illness. Those prison psychiatrists in Illinois didn't prescribe antidepressants and anti-anxiety medication for no reason. They had diagnosed him as suffering from various disorders and wanted to know the possibility of a learning disability. But Dr. Allender's report back then, he basically didn't find him mentally impaired and concluded that he was depressed because of the situation that he found himself in. But, you know, I mean, Dr. Allender knew at the time that he was taking these medications and he didn't come to the conclusion that you're now putting forth that someone might if we just investigate it further. Dr. Allender, with regard to that, only had Mr. West self-reporting. He did not have defense counsel produce no records to Dr. Allender and, frankly, defense counsel couldn't produce all the required records because the mitigation investigation began in earnest after the trial court rejected the ill-conceived theory that the death penalty could not be imposed in a felony murder case in Arizona. Had the trial counsel introduced the evidence suggesting he should have, which may or may not be there, how would that have materially altered the, I guess, the factors that the trial court was weighing in determining the outcome? Well, Your Honor, that's a good question. And the real problem is there's cognitive incapacity on the part of Mr. West. That was identified by Dr. Allender. That would be further developed in an evidentiary hearing. That would support the statutory mitigating factor that Mr. West was unable to appreciate the nature and quality of his acts and the wrongfulness of those acts. Isn't that the standard for an insanity defense? It's not quite, Your Honor. In Arizona, Arizona uses the McNaughton standard, which has cognitive incapacity and moral incapacity, but under the statutory mitigating factor in Arizona, it has the moral incapacity factor and volitional incapacity, which is inability to conform one's conduct to the requirements of law. How would we get around the strategic decision that the attorney made at that time, knowing that he had some cognitive issues, deciding to proceed more, felt that it would be more effective on the substance abuse, and calling family members that talked about the abuse? And, you know, how do we get around that? That doesn't seem completely unreasonable. I'm going to quarrel, Your Honor, with the characterization that counsel made as strategic judge. We don't know what he commissioned Dr. Allender to evaluate Mr. West for. Was it competency and sanity? Those are very typical things in the trial court to have a client evaluated for prior to trial. The fact that Dr. Allender had no family interviews, had nothing about Mr. West's medical history. If he didn't make a strategic decision, you know, you want an evidentiary hearing, why don't we have a declaration saying it wasn't, you know, it's not uncommon for lawyers in death penalty cases to fall on their sword and say, I made a boo-boo. Well, he could, Your Honor. Again, I'm not sure what Mr. Daly or Ms. Fiorillo would say today, but again, we came to this court, in this case, after it was already in the Ninth Circuit. That is something you would need to get an evidentiary hearing. I mean, I'm still getting back to, you're saying, this is everything we want to do now. We want an evidentiary hearing to figure out what we really should be doing in an evidentiary hearing. No, we have a plan and a road map as to where we're going with an evidentiary hearing should this court grant one. We're not fumbling around trying to find the stuff. You've got one to get declarations from those lawyers before the district court. Perhaps that could have been done, Your Honor. That's not what Ms. Ryan did. And again, part of her problem was she's a sole practitioner. Every time she asked for money to do this mitigation investigation, she was shot down. Five separate requests for funds, all denied. A lot of sole practitioners where we practice aren't in a position to go out and fund these things themselves. So should she have gotten a declaration from Daly? Maybe, but Mr. Daly, on the record, makes inconsistent representations to the trial court as to whether he has done any mitigation preparation or not. In Ron Pillard, that was one of the reasons why the state court in Pennsylvania ordered the evidentiary hearing so that the deliberative process of the attorney as well as the mental health mitigation presented in the court could rule on that. That's what was before the United States Supreme Court when they decided the Ron Pillard case. In Mr. West's case, unfortunately, yeah, there probably were some T's that could have been crossed and some I's dotted. Maybe that didn't happen. But Ms. Ryan, I think, did enough to at least get this thing to an evidentiary hearing. She was extremely diligent in state court trying to develop her facts, and she alleged enough with respect to a colorable claim. And this court said in Earp v. Zarnofsky, that's a low bar. You don't have to prove your case at this stage. You just have to prove that the facts that you're alleging have proven true and entitled you to relief. That's the bar at this point, and that's why we would like an evidentiary hearing at this point, because we think that Dr. Allender is poised to give us the statutory mitigating factor and other non-statutory mitigation that he started to identify in 1987. Two steps. First, you need something better from Allender than you have, which I think you're implicitly conceding. You're saying Allender could come up with more, you think. Allender hasn't said he would, just said maybe. And second, you need to show that the lawyer fell below the already very low Strickland standard of being as bad as no lawyer at all because he didn't prime the pump more on Allender. We don't know if he ever asked Allender a single question or commissioned him to investigate for mental state mitigation. It may simply have been competency and sanity. As I suggested earlier, we need, I mean, that's what an evidentiary hearing would flesh out. Well, I guess I don't understand why we don't have a declaration from Mr. Dolly. I mean, that is a problem for me because there is, for instance, in the record where he makes representations to the trial court judge that this is strategic on his part not to call even Allender at that point. And if he had called Allender, even though I agree that he was deficient in not understanding that the death penalty could still be imposed for a felony murder, that the court granted continuances and he would have given as much time as he needed to go out and get support for Allender or go further. I mean, I just don't see why we don't have even a statement from Mr. Dolly saying, I tried to get the money to go get Dr. Allender's consultation and it was denied me. Or, all right, I went there and it wasn't enough. I mean, it just seems really missing. Your Honor, you're probably right. Perhaps more should have been done with respect to what the lawyers were thinking. But on this record, we've got inconsistent statements from Mr. Dolly, and one of his statements was undercut by his co-counsel. But when they went to the death penalty hearing in the spring of 1988, there's no showing on this record that Dr. Allender ever evaluated Mr. West for mental health mitigation purposes and not simply for competency and sanity determination. Everything investigated, there are all these rabbit trails, and then they never go anywhere. For example, the depression. Oh, maybe he has a serious mental disease. He's suffering depression in prison. And then you look it up, and he got a phone call. His girlfriend was pregnant by another man. He got depressed because he was losing his girlfriend. You picked out an example, Your Honor, but there are other examples in those prison records that further demonstrate that he had real mental illness going on for which psychiatrists were prescribing antipsychotic medication for him. So, yeah, there are snippets where maybe it doesn't sound that compelling, but he was seen by psychiatrists as early as the mid-1980s in the Illinois prisons, and he had diagnoses of mental illness. That should have been followed up on by counsel. Was there ever a request in the records where West, I'm just saying the West side, ever requested the district court for an evidentiary hearing to determine the purposes of Dr. Allen's pre-trial evaluation? Ms. Ryan did not specifically state that, but each pleading she filed in the district court included a request for an evidentiary hearing on the claims she presented. And because, I mean, frankly, most of her claims went to the district court. So isn't a specific request for an evidentiary hearing to determine the purpose of Dr. Allender's pre-trial evaluation? Your Honor, in the third amended petition, she says counsel should have produced Dr. Allender's report mitigation and called him as a witness. At the end of the pleading, she says, we request an evidentiary hearing on all of the claims in the petition. She makes that request, I think, in four separate pleadings in the U.S. district court. She asked for an evidentiary hearing, and at least implicit in what she has pleaded, she certainly was anticipating that she was going to get to develop those facts of an evidentiary hearing. I mean, after all, she was the lawyer. So there's not a specific request, but what you're saying is if you take the complaint and you match it with her continual request for an evidentiary hearing, the district court was on notice that she was requesting an evidentiary hearing to determine the purposes of Dr. Allender's pre-trial evaluation? Of all of her ineffective assistance of counsel claims, there were a couple of them in the petition. There was a guilt stage claim as well. But the main thrust of the entire federal proceeding was an attack on trial counsel for not investigating and presenting a mitigation. So I guess if I'm understanding you correctly, there isn't a specific request, but if you connect the dots, the request is there. Well, that's correct. And as I said, I don't think it takes a lot of connecting the dots because she fairly forcefully pleaded that counsel should have produced Dr. Allender to testify. The thrust of her argument in the body of the petition was Dr. Allender should have been called as a mitigation witness. I don't actually know why there's anything of interest there. Usually when you send your client to a psychologist or a psychiatrist or somebody else to deal with sentencing, a social worker, whoever is going to do it for you, you just say, I'm this defense lawyer. I'm looking for something that can reduce the severity of the sentence. You're the expert. I don't want to tell you and limit you in the exploration you can make of questions you can ask. Could you do whatever you need to do and find out for me if there's anything that is of significance here? And then they do it. I remember doing that, and a psychologist that I used had various kinds of paper and pencil tests that he used that were actually quite useful for indicating whether there's an organic brain disorder to be investigated further, that sort of thing. I wouldn't have known what test to tell him to use. Your Honor, your question. Why would they have sent this fellow to Allender except to see if there's something Allender can find that would get the guy a break? Your question, as you stated, it presupposed that. You said the lawyer sent him to Allender for the purpose of developing mental state mitigation. This record doesn't speak to that. This record doesn't indicate that that was the purpose. And we know from Ron Pilla versus Baird. Why else would he have been talking to a psychologist? Pardon me? Why else was he talking to the psychologist? Because he thought Mr. At first he very well may have thought Mr. West was crazy, and it may have been a competency to stand trial evaluation. We know from the Ron Pilla versus Baird decision that counsel is ineffective if they don't produce relevant records, interviews and the like to the mental health expert who's evaluated. If the purpose is for mental health mitigation, you have a duty to produce those records. We know that nothing was produced. At the beginning of Dr. Allender's 1987 report, he identifies what testing materials he employed with Mr. West. There's not a single report record. There's nothing that accompanies that report. And we know for a fact that fellow We don't know if he sent him to Allender for an insanity defense, incompetence to stand trial or mitigation. No, sir. No, sir. I think we need to put Mr. Dolly on the witness stand. I think Dr. Allender said that in the 2008 letter that he doesn't recall the purpose other than he wanted Mr. Dolly wanted a neuropsychological evaluation because of alcohol and drugs and head injuries. That's all Dr. Allender noted. But, again, Ron Pilla requires that you have to do the rest of your mitigation investigation, and to the extent you develop information that's relevant to your mental health expert for mitigation, you have to produce those records to him. Mr. Dolly didn't begin that investigation until more than six months later. All right. If we were to grant an evidentiary hearing, what evidence would you put on? I would have Dr. Allender testify. Why? Because he's going to find evidence of cognitive impairment that goes to the statutory mitigating factor under the state statute. He's going to find, but you don't know that for sure, right? I have a good idea from his, certainly from the 2008 letter. You only know what an expert's going to find when he hasn't found it yet. They're the kind of experts that we used to call a ruder word than prostitute. Your Honor, he wants face-to-face contact with Mr. West before he swears, before he averts in a declaration any particular set of facts. But he says in the 2008 that, had I known, you know, Mr. West self-reported to me that he came from an idyllic family situation where his father was good to him. It turns out the mitigation investigation that was done six months later shows all of that to be categorically false. And Dr. Allender says, I think that would have changed my diagnosis substantially, probably to PTSD, which is this court in Stiers and a bunch of cases, U.S. Supreme Court in Porter, recognizes this to be highly mitigating. And it would support the statutory mitigating factor. So that would be one mitigating factor. What else would you put on? Dr. Cobell. Dr. Cobell did some additional testing to flesh out the, he found some signs of organic brain damage that Dr. Allender's testing didn't pick up. Dr. Cobell also indicates to us what the PET scan and the MRI, what they would be useful for in picking up with regards to. They haven't been done yet. No, those are expensive, Your Honor. And frankly, at the Federal Public Defender, if we can't go someplace with the evidence, they're not going to give us the money to do that. The prison's going to have to rid them to a facility, and that requires security. It's inconvenient to a lot of folks. And so there's certain things that we're reluctant to try to do. Dr. And the lawyer, Dolly, is he available? Yes. He and Ms. Fiorillo are alive and well and living in Tucson, Arizona. They're available. The U.S. Supreme Court in Wiggins and in Roncillo said those are the people you've got to get on the stand. You have to sort out the deliberative process. Because at this point, and the State even used the words assumption in its brief, we're assuming that Dolly took certain actions or commissioned Dr. Allender to do certain things. The record doesn't support those assumptions. It simply doesn't. And we respectfully request the opportunity to gather all this. And, Your Honors, most of the cases that come to Your Honors, especially the California cases, have been through an evidentiary hearing. In Arizona, and the records that Your Honors get will bear this out, in Arizona we get no evidentiary hearings in State court, and we only get evidentiary hearings in Federal court if this court sends them back. Counsel, we're way over time. And, unfortunately, there's none left for rebuttal. But it's a death penalty case. And what I'd like you to do is plan on five minutes of rebuttal time anyway. Thank you, Your Honor. I appreciate that, Your Honor. All right. Good morning, Your Honors. May it please the Court, I'm Jonathan Bass. I'm the Assistant Attorney General of the State of Arizona, and I represent the appellee in this matter. And just to pick up on some of the questioning that the Court has been. . . Can you address, there was a lot of discussion about lack of money, you know, that there was no money to get expert funding, and that's really there. And I know you argue in your brief that West failed to ask for requests for expert funding, and then that shows an abandonment of an IAC claim. And, you know, what, I'm not really sure how this, you know, I don't doubt that there isn't a lot of money out there. There doesn't seem to be a big pot of money out there anywhere at this point. And, but, you know, how does that, from your perspective, play into the issues that we have to decide? And can Mr. West make that argument that, you know, if there had been money, and then they could have had these experts, and that's why they didn't have those experts, and that's why they couldn't make the showing that was necessary for the evidentiary hearing, and therefore, you know, now they need to have the evidentiary hearing to discover what Dr. Allender would have really said? Judge Callahan, I think the only way that he could make that argument, I don't think it's a valid argument at all, but the only way that it could even be made is if no money was appropriated for even his legitimate request. For example, the state court, in this report, the judge found that counsel made a conscious decision to abandon asking for a mental health investigation. Counsel received money in state court for investigations. How much and at what stage? I don't know how much. By what stage, sir, do you mean? I'm thinking if you send your fellow over to the hospital for a PET scan, and a PET scan is the most expensive kind of brain scan. It costs big bucks. I don't know if it could have been done. I don't know if it could have been done. It may well have been done, but there really isn't any evidence in the record that money was ever issued here. When she asked, when she made a legitimate request, she was given the money for it. The problem with the… Was she turned down on some requests? She was turned down on the, well, on state court, certainly on pursuing the innovative assistance claim, because she, as has been discussed here, she presented no prima facie case. She presented no affidavits. The time to talk to Judge Dolly, or the judge after this case, but the time to talk to Frank Dolly about what his strategy was and what he did was in 1995 and 1996. The record shows that the trial court at the time, Judge Savalos in Pima County, told Ms. Ryan, you know, I'll reconsider your request, but you've got to give me something to work with. Come back and give me something to work with, and she never did. She gave Judge Savalos what appears to be some information from Dr. Thompson, somebody who was not at all involved in the original sentencing, and who was basing, I guess, his opinion of Mr. West on what Carl Ryan was telling him at the time, and then later appeared this affidavit, or not affidavit, but this report from Dr. Allen in 1987. So the dots weren't connected, and the record, I think, is clear that had they been connected, she would have gotten money and she would have gotten an evidentiary hearing, but she chose not to go there, and I think the argument can be made not that she was ineffective or not that she somehow didn't understand what she was doing, but the claim simply had no merit. You know, the record is so big I really have not been able to master it. Do you happen to remember or have a yellow sticky that tells so I could look at one of her ineffectual requests and see that it was justifiably turned down, and one of her successful requests and see that it was granted? I can refer you to that portion of the record. Where it appears in the record is in the excerpts of Record Volume 4. She files an ex parte request, a motion rather, for investigators and other appropriate experts. This is Excerpt of Record Volume 4. I'm reading at page 662. There's a hearing on it, and when it comes to talking about the claim that we're talking about here today, the mental health claim, Ms. Lyon gives the judge her take on what Mr. Rust was like at the time, in 1996. She, in fact, says that he was doing really well, but then she began getting letters from him that she felt were a little incoherent, and so she wants to go forward, and the judge's response is on page 670, I have reviewed all the information provided by counsel to the court in support of the various requests, and the court rules as follows, and I apologize because there is a modified figure here. The court will authorize the payment of $20 per hour for a paralegal to assist Ms. Lyon and set a cap for services at this time of $2,000 as and for paralegal services, et cetera. The court authorizes an investigator at $20 an hour up to $1,000 if it becomes necessary to make an application for additional funds. Then the request for mental health expert and pharmacological expert is denied. But the judge says, if you're able to present more specific information to the court regarding the necessity of the expert testimony in the area of mental health or pharmacology, how will you consider your request? It just never comes forward. The judge never gets specific information again. It eventually denies the claim on the merits. The same thing happens in federal court, essentially. You don't get money for certain requests, but as the district court found, apparently there was a conscious decision to abandon, if you will, or something like that to do with mental health. Well, Matt, your position, well, you set forth the position of abandonment, but then you also set forth the position that counsel was not diligent and that that's a requirement in order to get a hearing, right? That's right. I think that the district, but I think that anyway, whether there was diligence or not, the matter has been dealt with on the merits. But give me your best argument on why counsel was not diligent. Have a safe word? Well, maybe. Or just overall. Overall. In terms of, I question the other side in terms of that when I, you know, I mean posited it on the other end saying, it appears to me you're asking for an evidentiary hearing to conduct discovery so that then you could make arguments as to why you would have an evidentiary hearing. And, you know, that's the other extreme. But then tell me why there wasn't diligence to entitle them to an evidentiary hearing. Well, there wasn't diligence because counsel wasn't putting forth the proper information to the court. Given opportunities to do so, counsel did not. We can call that an abandonment. We can just say that counsel simply wasn't giving the court what the court needed. Well, what would they have need to show so that they could have a hearing? It's been discussed. I think she could have, and this was in 1995, 1996. This was not that long after the sentence. She could have certainly gone to Frank Dolly. She could have gone to his co-counsel. She could have gone to any one of Mr. West's relatives, friends, et cetera, people that were involved. She could have gone to Dr. Allison and said, what did you not have? I mean, the questions that are being asked today could have been asked in 1995, 1996. Why it wasn't done that way I can only speculate because this was a competent PCR counsel. And I can argue, and it certainly would suit my purpose here, but I could argue that, frankly, when you get right down to it, just as the district court did in its order, you can look at the merits of this claim. And you can see that there's simply that the counsel made a reasonable decision to portray Mr. West's sentencing as essentially a man who had been abusing drugs and alcohol for 20 years. He was ravaged. He was an addict. He was controlled by the substances. That's the portion of Mr. West that the counsel wanted to present the judge to him. And there's simply nothing wrong with that strategy. And there is nothing in the record that really contradicts the reasonableness of that strategy. And I think, perhaps, I don't know. Now, if original counsel had taken the view, the tact that was originally sent out, that you can't sentence someone to death on a felony murder, that would be a considerably different case, wouldn't it be? Well, you know, that's an interesting question about why that was raised at the time. And Mr. Ghaly has taken some thrashing in this case over why he did it. But I think there is a rational reason for why he did it at the time. It wouldn't be done today. It probably wouldn't have been done five years or maybe even three years after this case. But at the time, Edmund Tyson was relatively new. Tyson had just come down in 87. Mr. Ghaly notes in a sentencing memorandum that he submits to the court that the Arizona Supreme Court had looked at felony murder as a mitigating circumstance. And Mr. Ghaly had done his work, and he had found that in Mr. West's case, where burglary was the credit of felony, an inherently nonviolent crime, he couldn't find anybody who had been sentenced to death in Arizona on a felony murder conviction where burglary had been the credit of felony. And I think that it was not unreasonable for him to essentially go to Judge Meehan and say, today we would say, you know, we need Edmund Tyson findings, but at the time I think it would be reasonable for him to say, I've got what I think is a tremendously strong piece of mitigating evidence. I'd like to know now whether you are going to find it so mitigating that we can just stop right now and you're going to sentence him to life. And that, I believe, is what Mr. Ghaly was trying to do. I don't think it was some, you know, misunderstanding of what the law was or that he didn't understand where he was at the time, or didn't understand felony murder. All right, well, that obviously didn't happen, though, because the judge said, I'm not going to, you know, tell me don't go there, and I'm not going to buy that, and so you better put, you better do something else. Exactly. And as soon as that was said, Mr. Ghaly went right into a full-bore mitigation research and so on, and the investigation finally started. I'm not at all conceding that he had not done some mitigating work ahead of time. Well, what do we know about the strategic, you know, what is there out there in terms of whether it was a strategic decision not to go with the mental health impairment? I think because, as the district court noted in its order, his primary mental health problem was drugs and alcohol. And why not then get a substance abuse expert who can speak to that very point in the detail that Mr. Hickey did and present a rather sympathetic picture of a man who's simply, you know, in control of drugs and alcohol? That's not that great. It's a version of the some other dude did it defense, except you're blaming the cocaine instead of some other dude. The problem with blaming the cocaine is you're not supposed to use cocaine. So it's really pretty last-ditch as a mitigation case goes. I suppose, of course, sometimes there just isn't any good mitigation. Well, did he always stay with this some other dude did it, or does he ever back off of that, Mr. West? In his elocution, he does not admit that he committed the murder. In his elocution, he denied responsibility? Yes. That's a problem. You know, the problem that I have with your case is actually a little different from what we've been talking about, and that is usually we get a death penalty case. The person sentenced to death is a real monster, just a frightening, horrible monster. And this fellow has committed a really bad murder, but he's not as monstrous as the usual one that we see. It's sort of hard to believe there isn't more to be said on his behalf, but we don't seem to have it on the record. Well, that just may be the way it is. I understand that. I think we've got enough. Is it just a real tough judge? It may be a real tough judge, but it also may be, frankly, a lack of much else. I mean, we've talked at length about Dr. Allinger's report. This report describes it as equivocal. He doesn't get, Mr. Daly, much to work with. I don't see any reason why Dr. Allinger rather couldn't have died. Honestly, when the penalty phase now, I mean, I'm a California judge and was, you know, a California lawyer, and, you know, we've always had the penalty phase with jurors. And so when you only have one person to either convince of mitigation or aggravation, I don't think anyone can say that the dynamics are exactly the same as when you have 12 people. I think that's a good point. And they have to, you know, a prosecutor has to get 12 to agree to death, and there's a more likelihood of having someone that might be a little more sympathetic to someone's life story out of 12 than there is with one, you know. But on the other hand, if you get one really sympathetic judge, then that's bad for the prosecutors, but it's good for the defendants. I think it's a good point, Your Honor. I mean, factually, this probably isn't as ugly as a lot of the death penalty cases that we see. Right. I don't doubt that. I don't doubt that. And I think that that's certainly Mr. Dahle's opinion at the time when he was approaching the judge and saying, maybe you could find this a well-intended mitigation right now. I mean, I think that's true. I think looking at death penalty cases certainly in Arizona since 1988, this is not one of them. I mean, a lot of times there's a lot more torture. I mean, you know, it's child rape, abduction, you know, or sometimes it's even more than one person that's killed and they make the other person watch. Or if it's a robbery, it's one of those gratuitous things where they could get away and then they just go back and kill the witnesses. I mean, this is kind of a – I mean, we don't know, but it's either a burglary gone wrong and he is tied up and apparently he didn't die right away, so that isn't that good for the defendant. But it isn't – you know, I guess it's hard to put the horror meter on egregiousness, but I think what Judge Kleinfeld is saying, and I kind of noticed it too, the facts aren't quite as grisly as some. I won't deny that. But, I mean, I will say that really we've got three strong aggregators here. I mean, they've never really been challenged. I mean, there is the prior conviction, there is the F6 in Arizona, but Kool-Aid isn't a great way of killing. There's a pecuniary gain of finding. Those are, in and of themselves, pretty strong aggregating circumstances, even if the exact circumstances of a crime that couldn't be charged as premeditated but was done as a felony murder might seem less egregious than some cases that we've all seen. But, you know, that being the case, I mean, he did have a death penalty and it was reviewed by five judges at the Arizona Supreme Court on independent review, and that was not a court that was shy about reversing a date in its sentences when they thought it was appropriate. During this period, the court there was still doing proportionality review. They've since abandoned that, but at this time, this was given the proportionality review and we simply have that record we have. Just to note, I guess, about other psychological evidence perhaps that could have been gone into, there doesn't appear to be much. There is a statement in Judge Dolly's or Frank Dolly's sentencing memo, I think the May 4th one, where he does say something about a diagnosis of borderline personality disorder. I don't know exactly where that comes from. I don't know if it's unreasonable to link that back to Dr. Overbeck. There is no indication, by the way, and I want to just be supportive of this, there's no indication that these doctors were consulted for a, what we call in Arizona, a rule 11 or a competency hearing to see whether he was competent to stand trial. That's not the case. They were consulted before trial, I submit, to see if there, if any information could develop to perhaps affect the way that the case is tried and then later. Now, when the prosecutor was trying to get discovery under Arizona law at the time, what would have entitled the prosecutor to discovery? Because there was some discussion about, well, we're not going to call them in the guilt phase, which the guilt phase was the jury verdict, right? Yes. Right. But if they had been planning to call those experts, say, to mitigate intent or, you know, something along those lines, when and how would the prosecutor have been entitled to see those doctors' reports? I think it would have been done as it would have been done at trial. I think they would have made arrangements for the prosecutor perhaps to simply interview these doctors. Well, when would they get to see him under the law at that time? Say, if you were going to call, if the defense had said, I'm going to call these doctors to show that he didn't, he wasn't, he didn't have, it wasn't a first degree, you know, somehow to mitigate the intent, because if it wasn't first degree, you can't get the death penalty, right? Yes, that's right. But first degree premeditated or a felony. Right. But, I mean, but say if you're crazed on drugs or you want to put that evidence in or you're not able to premeditate or you're not, when would the prosecutor have been able to get those reports? When the doctor testifies or before or? Oh, I think he would have gotten them before. I can't give you a time frame as far as trial goes then, but he would have gotten them before trial. Okay. And so the defense here said, we're not going to call them in the guilt phase so the court deferred ruling until the penalty phase or something? Well, my understanding of that, of that conversation was that the West had already been convicted. And so if we're talking about the conversation in the excerpt from record volume two, where Mr. Dahle says, we did have Mr. West examined, we made a choice, again, as a matter of strategy, not to call those who examined Mr. West in here to testify, that is in anticipation of the sentencing hearing. That was after the conviction? Yes. You're saying that took place after the conviction? Yes. And it's worth noting, I mean, Strickland does say clearly that, you know, we go back in time potentially and look at what was going on in the context of the judge's sentencing in those days. It was not unlike noncapital sentencing in the sense that you have a jury who is called to convict or try the case, come back with a verdict. If it's guilty, because you have a judge who has to make the sentencing decision, these sentencing would then get continued. I mean, the defendant almost always would wait a time. And that would be the time when a great deal, at least in this period, a great deal of media had an investigation into what had gone on. I don't think what we've seen in this record is particularly unusual. Mr. Dahle has some mitigation in mind. He wants to see where the case is going. It's a conviction. He has to judge for Edmund Tyson findings. He loses. Now he's got to go forward with his full-blown mitigation investigation, I think knowing that what he wants to pursue is a substance abuse kind of presentation. But had these doctors, I think to answer your question, had these doctors or Dr. Allender, I'm not sure that the state could have had access to them before the investigation. That's my understanding. I don't know. I mean, off the top of my head, I think that's right. Is the report that the lawyer had at the time when he was making this strategic decision, the letter from Dr. Allender in December 1 and December 3 about, well, actually the way it's dated, he doesn't date it when he signs it. He says, date of evaluation, December 1 and December 3, 1987. Is that what you're referring to? I think so. That's what I'm asking you. Yes. So what the lawyer had before him was a report that says the results are difficult to interpret in terms of organic impairment due to head injury and appear more consistent with an individual of low educational status who may have some evidence of a learning disability. The one deficit which he demonstrates is some right-handed motor slowing. While organic impairment cannot be ruled out as a cause of this deficit, it is not substantial enough to interpret as evidence of organic impairment without collaborative evidence on other tasks. He'd given them other tasks, motor tasks. Yes. And I think those tasks are probably... That's it? That's what he had? As far as I know, that's all he had. I think that's what the record shows. If they had any other conversations or anything else, I'm not aware of it, but I think the record shows that he clearly had this report. It may well, and I understand the record, we don't have it, but he would have had some feedback about the report. In either event, there simply wasn't enough there, one could argue, to really pursue a psychological sort of mental health kind of sentencing defense. Substance abuse is everywhere in this space, where counsel reasonably wanted to go. And you could argue that a psychological defense and talk of adjustment disorders and borderline personality disorders or mild cognitive impairment or whatever would simply have diluted that kind of... would have detracted from the source of it, which was the drugs and alcohol. As weak as that may be as a sentencing argument, that's, I think, the best thing that we had. If there are no other questions, then I'll sit down.  Thank you, counsel. Thank you. Thank you, Your Honors. Can you tell me, you can make this quick because I know you, I'm sure, probably have a few things you want to say, but the fact that the defendant, Mr. West, maintains that he was not guilty throughout, I mean, he said that at the sentencing hearing even after he'd been convicted, right? I mean, he always maintained his innocence. How does, I mean... That's the defense of the crime, Your Honor. In elocution, he persisted in that, and I can speak to that. Well, but doesn't that kind of put the defense lawyer in a little more difficult situation of convincing someone of the mitigating factors? I mean, that's a reality that Mr. Dawley had to deal with, right? It might have impacted the guilt-innocence defense. I don't think it has any impact on the presentation of mitigation. And one thing that's critical here, Your Honor, is... It's hard to prove remorse. Well, it's hard to prove remorse is genuine even when it's spoken, Your Honors. Now, the facts of this case are that Tom West left from Phoenix and went to Tucson to visit a woman that he lived with in Illinois years before. Mr. West had no vehicle. Mr. West had no money. Mr. West stayed at this woman's house. She testified as a guilt-stage witness. Polly Maylou is her name. Somehow, Mr. West gets out to the far western reaches of Pima County to commit a burglary. Several days later, when he leaves Phoenix to come back down to collect some of the proceeds, Polly meets him out in the country where the pile of stuff is. The prosecution apparently doesn't pursue Polly Maylou, or the other residents of the house that Polly testified also gave Mr. West rides around. Polly worked at the Circle K where Mr. Bortle was a customer. This really smelled as if it were some kind of inside job. Polly and Tom went there to buy some things at a garage sale. Tom burglarizes the place, takes some stuff, hides it in the country. Polly mysteriously shows up at the site where the goods are stored on the day that Tom goes to pick the stuff up. So if Tom is concerned that his lawyers didn't try to apportion blame among other folks who were involved, that the prosecution didn't go after, I think that's not unreasonable, especially given his fragile mental state. As he told Dr. Allender, he was still doing high doses of cocaine and alcohol in those days after he left Phoenix and he shows up in Tucson, and that's in the month prior to the burglary. What he says in the accusation is that his counsel didn't have the knife tested, but there wasn't any evidence that there were knife wounds. The evidence was that the victim was beaten up and hogtied. That's correct. I think you're right in that it was just Mr. West speculating that if his counsel went through the trouble, and maybe from watching enough television that you hope for some contamination on the family, you hope for whatever you hope for, but it was grounded at least in the fact that it looks like somebody else was involved in this and escaped culpability. I think that's the process. And there were some actual innocence arguments made that they're just not in front of us on the COI, right? That's correct. That's correct, Your Honor. I'd like to, and I appreciate the time that Your Honor has given me for rebuttal, I'd like to speak to the assertion that when the court rejected the felony murder theory, that Mr. Dali went full bore ahead to discover the mitigation that needed to be presented. The requirements that the Supreme Court has imposed on us as criminal defense lawyers is to begin that mitigation investigation at the same time after we're appointed on the case we begin our guilt phase investigation. And I know that the court has asked for a briefing on Van Hook, and there's some debate as to which ABA standards apply or don't apply. It's just good lawyering in a death case where a penalty is a trial on the question of the punishment to be imposed. Every counsel worth his weight going back to the 80s, 70s, after Greg versus George, you would have understood you've got to begin that mitigation phase early. Sometimes there's an intertwining of those mental state defenses you have to be aware of. In this particular case, Mr. Dali put all those eggs in the basket that felony murder was a way to beat this thing. And he told the judge on the record he was looking for a silver bullet. He wasn't going to just put on other mitigation and have the judge reject it. I don't see why that's so bad. I mean, it looks like he has no mitigation. He has nothing. All he can prove is that this guy's a real heavy drug user and basically was doing a burglary and he was so hopped up on dope that he beat the guy to death. Just nothing. Jet lag personality disorder makes him look worse. So it looks like the best he has is, judge, he didn't go in there to kill somebody. This isn't premeditated and deliberated. It's just felony murder, which means it's a non-murder that got out of hand. And that's not as bad as a premeditated, deliberated murder. It looks like that's the best he's got. The Supreme Court requires that you do that mitigation investigation of all reasonably available mitigation before you settle on your mitigation theory. He had. He'd already talked to Dr. Allender. He'd gotten Dr. Allender's report. Big disappointment. I'm not sure it was a big disappointment. I don't believe it was for mitigation purposes, period. But we know that Mr. Dolly didn't even begin to investigate the family witnesses. Mr. West was from Illinois. All those family members were in Illinois. It took some doing to have to go there to interview those folks. The very first witness interview by the defense investigator was performed on June 7th of 1988. Do we know that he didn't telephone him before that? There's no evidence on this record. There's no billing. Is there evidence that he didn't? You're telling me he didn't do anything. That's correct. Before that. Do you have evidence for what you're telling me? For example, an affidavit from a lawyer or somebody on his staff or that he never called anyone in West's family before that? No, but I don't think that's critical to the issue because Mr. Dolly is already on the record. I read the quote, I think, for Judge Warlaw earlier. Mr. Dolly said when he was asked by the prosecutor, are you going to put on mental state evidence, he said, we haven't had him examined yet for mental state mitigation. Okay, that's on April 5th. On May 4th, he has his felony murder theory shot down by the trial court. Five weeks later, the investigator makes his first appearance in Illinois to go roust out the family members to see what they're going to say. There's nothing on this record. There's nothing. There's no billing records. There's nothing to suggest anywhere in here that Mr. Dolly approached any of Tom West's family. In fact, Your Honor, I think what's telling on this point is when the court rejects the felony murder theory, he says to Mr. West, Mr. West, do you know you have a right to put on mitigating evidence in a penalty phase? I don't know if your lawyer's told you that, but you have that right. The state's going to put on aggravation. You have a right to put on mitigation. Are there any witnesses you could tell your lawyer about that he could put on on your behalf that might make a difference to me in imposing a sentence? That's a fairly telling statement, Judge. I don't think we necessarily need the affidavit of defense counsel. What was the answer? Pardon me? What was the answer? Mr. West didn't know. Mr. Dolly hadn't told him, but when the judge said, do you want him to go out and investigate the mitigation, Mr. West said yes. Why is the judge canvassing Mr. West as to his knowledge about how a capital sentencing proceeding operates? Shouldn't the lawyer have spent voluminous time building the rapport, building the relationship with probably a paranoid, drug addict client? Doesn't he have to invest the time? Those of us that have been lawyers at different stages know sometimes a client requires some hand-holding, especially in this context. This guy's on trial for his life. The state's prosecuting him, and the state's appointing him the lawyers to represent him. And from Mr. West's vantage point, and he made clear both in the state court and in the federal court, I don't really trust these lawyers I'm getting. I don't think they're doing what they're supposed to do. He made that point to Judge Burry also in the U.S. District Court, and Judge Burry was sympathetic and said, Mr. West, your case is not going to turn on whether Ms. Ryan gets the appropriate doctors or not. We've given you a lot of extra time, as you know.  Thank you. Thank you, counsel. Mr. West versus Ryan is submitted. Thank you.
judges: Kleinfeld, Wardlaw, Callahan